**Elizabeth E. Howard, OSB #01295**
E-Mail:  eeh@dunn-carney.com
Dunn Carney Allen Higgins & Tongue LLP
851 SW Sixth Avenue, Suite 1500
Portland, OR  97204
Telephone: (503) 224-6440
Facsimile: (503) 224-7324

Attorneys for Applicants Amicus-Intervenors

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N., OREGON NATURAL RESOURCES COUNCIL FUND, and NORTHWEST ENVIRONMENTAL DEFENSE CENTER,** | No. CV-06-523-HO |
| Plaintiffs, | **AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **SHIRLEY GAMMON**, Lakeview District Manager, BLM, **THOMAS E. RASMUSSEN**, Lakeview Resource Area Field Manager, BLM, **ELAINE M. BRONG**, State Director, Oregon/ Washington BLM, **LYNN SCARLETT**, Secretary (Acting), United States Department of the Interior, **U.S. BUREAU OF LAND MANAGEMENT**, and **U.S. DEPARTMENT OF THE INTERIOR**, | |
| Defendants. | |

AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................................................. 1

STATUTORY AND REGULATORY FRAMEWORK ................................................... 5

    I.    National Environmental Policy Act ...................................................................... 5
    II.   Federal Land Management and Policy Act........................................................... 5
    III.  Public Rangelands Improvement Act ................................................................... 7
    IV.  The Taylor Grazing Act and FLPMA ................................................................. 7
    V.   Wilderness Areas and Wilderness Study Areas (WSAs)..................................... 8

STANDARD OF REVIEW ............................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.    BLM Had No Duty to Update Inventories Prior to Its Adoption of the
         Lakeview RMP ..................................................................................................... 10

         A.    The Lakeview RMP's Validity Does Not Rest on Whether the BLM Has
               Prepared  An Updated Inventory ............................................................... 10
         B.    NEPA Does Not Create An Alternative Route for Plaintiffs to Force
               the BLM to Perform Inventories Not Required by FLPMA................................. 14
         C.    BLM's Planning Process Involved Consideration of the Affected Environment,
               Including Specific Consideration of Roads, Recreational Sites,
               and Natural Areas ..................................................................................... 17

    II.   BLM's Alternatives Analysis Fulfilled the Requirements of NEPA:  BLM Fully
         Analyzed Grazing Levels..................................................................................... 22

         A.    BLM Studied a Sufficient Range of Alternatives for Livestock Grazing............. 22

    III.  Plaintiffs' Beaty Butte AMP Claims Fail for Lack of Prosecution
         and Because The Range of Alternatives Considered by the BLM Was Adequate.......... 30

    IV.  Plaintiffs Claims Concerning BLM's Grazing Suitability Analysis and
         Chiefly Valuable Determinations Are Non-Justiciable ................................................... 31

CONCLUSION .................................................................................................................. 34

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anchustegui v. Department of Agriculture*, 257 F.3d 1124 (9th Cir. 2001) .......................7

*Bowman Transport, Inc. v. Arkansas-Best Freight System*, 419 U.S. 281 (1974)..............9

*Center for Biological Diversity v. Bureau of Land Management*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006)...................................................................................................20

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).....................................9

*City of Angoon*, 803 F.2d 1016 ...........................................................................22, 26, 30

*Headwaters, Inc. v. BLM*, 914 F.2d 1174 (9th Cir. 1990) ...........................................23, 29

*Marsh v. Oregon Natural Resource Council*, 490 U.S. 360 (1989) ...................................9

*N. Alaska Environmental Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006) ............22, 23

*Norton v. Southern Utah Wilderness Association*, 542 U.S. 55 (2004)............................11

*Ore. Natural Desert Association v. Rasmussen*, 451 F. Supp. 2d 1202 (D. Or. 2006) ..........................................................................5, 13, 14, 15, 16, 17, 23, 24, 31

*Presidio Golf Club v. National Park Serv.*, 155 F.3d 1153 (9th Cir. 1998) *quoting Northwest Environmental Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520 (9th Cir. 1997)...................................................................................................23

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)..................................5

*Sierra Club v. Clark*, 756 F.2d 686 (9th Cir. 1985)........................................................26

*Westlands Water District v. U.S. Department of the Interior*, 376 F.3d 853 (9th Cir. 2004) ..............................................................................................................23

*Ore. Natural Desert As'n v. Bureau of Land Management*, 2005 WL 711663 (D. Or., March 29, 2005)........................................................4, 5, 12, 13, 15, 16, 17, 30, 34

# FEDERAL STATUTES

5 U.S.C. § 706-706 ...........................................................................................................10, 33

5 U.S.C. § 706(1) ...................................................................................................................33

5 U.S.C. § 706(21)(A) .....................................................................................................10, 33

16 U.S.C. § 1131-1136 ............................................................................................................9

16 U.S.C. § 1131(c) .................................................................................................................9

16 U.S.C. § 1132(b), (c) ..........................................................................................................9

40 C.F.R. § 1502.13 .................................................................................................................6

40 C.F.R. § 1502.14 .................................................................................................................6

40 C.F.R. § 1502.15 .................................................................................................................6

40 C.F.R. § 1502.15 ...........................................................................................................6, 18

40 C.F.R. § 1502.9(a)-(b) ........................................................................................................6

40 C.F.R. § 1502.9(c) ..............................................................................................................6

42 U.S.C. § 4321-4361 ............................................................................................................5

42 U.S.C. § 4332(2)(C) ............................................................................................................5

43 C.F.R. § 1601.0-2 ...............................................................................................................7

43 C.F.R. § 1601.0-5(n) ..........................................................................................................7

43 C.F.R. § 1610.4-4 .............................................................................................................19

43 U.S.C. § 1701-1784 ............................................................................................................6

43 U.S.C. § 1702(c) ...............................................................................................6, 7, 22, 26

43 U.S.C. § 1702(h) ......................................................................................................7, 25, 26

43 U.S.C. §§ 1702(h), 1732(a) ............................................................11, 12, 14, 16, 17

43 U.S.C. § 1711(a) ..........................................................................11, 12, 14, 16, 17

43 U.S.C. § 1712(a),(c)(4) ....................................................................................7, 13

43 U.S.C. § 1732(a), (b) ........................................................................6, 7, 22, 24, 25

43 U.S.C. § 1752(a), (d) ....................................................................................8

43 U.S.C. § 1782(a), (c) ....................................................................................9

43 U.S.C. § 1901-1908 ....................................................................................8

43 U.S.C. § 1903 ....................................................................................32

43 U.S.C. § 1903(a) ....................................................................................8, 32

43 U.S.C. § 1903(b) ....................................................................................8

43 U.S.C. § 315-315r ....................................................................................8, 32, 33

43 U.S.C. § 315b ....................................................................................8

Amicus-Intervenors Laird Ranch, LLC, Dennis Flynn Ranch, Harvey Ranch, Inc., Crump Ranch, and Thomas and Karmen O'Leary Ranch (hereafter "Amicus") hereby file this Amicus Curiae Brief opposing Plaintiffs Oregon Natural Desert Association ("ONDA"), Oregon Natural Resources Council Fund, and Northwest Environmental Defense Center's (hereafter "Plaintiffs") Motion for Summary Judgment (Docket No. 28).

## FACTUAL BACKGROUND

In November 2003, the Bureau of Land Management ("BLM") adopted the Lakeview Resource Management Plan ("RMP") and Record of Decision ("ROD") ("Lakeview RMP/ROD"). *See* AR Tab 2-33, Lakeview RMP/ROD, cover page. The Lakeview RMP covers 120 allotments that ranch families, such as Amicus, depend on to operate productive, sustainable grazing rotations. *See* AR Tab 2-33, Lakeview RMP/ROD, p. 8 (Table R-1); Declaration of Jesse Laird on behalf of Laird Ranch (Laird Dec.) ¶ 4. The Lakeview RMP documents the public lands administered by the BLM that are not allotted to or that are excluded from livestock grazing within the Lakeview BLM District. AR Tab 2-33, Lakeview RMP/ROD, p. 54. Many of these areas are within existing Wilderness Study Areas ("WSAs"). Id. For example, 124,800 acres not allotted to grazing fall within the Devils Garden, Four Craters, and Squaw Ridge WSAs. Id. Livestock grazing is also excluded from 11,796 acres in the Guano Creek WSA; 53,648 acres in the north half of the Diablo WSA; and 9,766 acres in the west half of the Abert Rim WSA. Id. In addition to the total 261,566 acres where grazing is not allowed, the Lakeview RMP states that livestock grazing will not be permitted where it is not compatible with other uses, and that additional exclosures could be implemented within the Lakeview allotments. Id. at 53. This possibility is a significant to Amicus and the other ranch families who depend on these allotments and grazing on the BLM-administered public lands to maintain economic and environmentally sustainable operations. The lost availability of these lands could be devastating to individual ranches, and would have a very negative effect on local communities in Lake County. *See, e.g.,* Laird Dec., ¶¶ 7-8; *see also* AR Tab 2-33, Summary of AMS, Appendix B-7

Page 1    AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

(noting that the economic dependence of local communities on industries served by agency land uses, such as livestock grazing, is high due to geographic isolation and lack of alternative employment opportunities). The creation of new WSAs that result in further exclusion of grazing would have a very negative effect on the ability of Amicus to maintain their sustainable ranching operations.

A year and a half after the adoption of the Lakeview RMP, the Oregon Natural Desert Association ("ONDA") submitted a wilderness resources inventory to the BLM. Declaration of Bill Marlett (Marlett Dec.), ¶¶ 15, 17 (ONDA began its inventorying efforts in 2004 and submitted its inventory report on April 1, 2005; AR Tab 2-33, Lakeview RMP/ROD, cover page (Lakeview RMP/ROD dated November 2003). At that point, Plaintiff ONDA asked BLM to go back and significantly amend the Lakeview RMP so as to treat the lands within ONDA's inventory as defacto WSAs. AR Tab 3-3, ONDA-Lakeview Wilderness Inventory Recommendations, pp. ii-iii (requesting an amendment to the Lakeview RMP that would treat of ONDA's proposed WSAs as Areas of Critical Environmental Concern ("ACECs") or as protected for wilderness characteristics). The end result of ONDA's request would have been to have more than half of the Lakeview District managed in special management designations that limit commercial and recreational activities. Id. (ONDA recommended 1.7 million of the 2.6 million acres of public lands within the Lakeview District as new WSAs).

Notably, there are some questionable positions taken in the ONDA-Lakeview Wilderness Inventory Recommendations ("ONDA Inventory"). For example, while ONDA claimed that its Juniper Mountain proposed WSA (a.k.a. Big Juniper proposed WSA) meets the requirements for a wilderness designation, the fact of the matter is that this area has a number of reservoirs and corrals or branding traps within its boundaries. AR Tab 3-3, ONDA-Lakeview Wilderness Inventory Recommendations, pp. 121-161; Supplemental Declaration of Jesse Laird on Behalf of Laird Ranch (Supp. Laird Dec.), ¶ 8. In addition, the proposed WSA is accessed on a regular basis by a number of passable roads for hauling cattle and equipment into and out of the Big

AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Juniper allotment, which generally overlaps ONDA's Juniper Mountain proposed WSA.  Supp. Laird Dec., ¶¶ 7, 9.  These characteristics significantly discount any claim that this area is largely affected by natural forces or that it would have a "feel of the wild."  *See* AR Tab 3-3, ONDA-Lakeview Wilderness Inventory Recommendations, p. 124.  It also removes the claim that this area lacks passable or regularly used roads.  Id. at 122-125.

Another example of how ONDA's Inventory does not  accurately portray the state of a proposed WSAs is provided by on-the-ground knowledge of the lands involved in the ONDA Poker Jim Ridge proposed WSA Addition to Orejana Canyon.  *See* AR Tab 3-3, ONDA-Lakeview Wilderness Inventory Recommendations, pp. 162-181.  Again, ONDA claims that this area meets the naturalness, roadlessness, and primitive recreation/opportunities for solitude requirements for wilderness consideration.  Id. at p. 162 (the area in question meets wilderness criteria).  However, this proposed WSA has numerous, "non-natural" improvements to support the livestock grazing activities conducted by Laird Ranch on the Warner Lakes/Turpin allotment, the North Bluejoint allotment, and the Orejana Canyon allotment.  Supp. Laird Dec., ¶¶ 3, 4; *see* AR Tab 3-3, ONDA-Lakeview Wilderness Inventory Recommendations, p. 165.  In addition, the Bluejoint Lake is mischaracterized by ONDA both with regards to its natural functions and with regards to the improvements that cross the lake when it is dry (i.e. roads and fences).  Id.; Supp. Laird Dec., ¶ 5.  These are just a few of the examples demonstrating inaccuracies in ONDA's Inventory.

The problems here demonstrate why it is so important to Amicus that the BLM not be required, through this lawsuit or otherwise, to adopt or even consider implementing Plaintiffs' proposed management strategy for the Lakeview District, which would require wilderness-like protection of 1.7 million non-wilderness acres within the Lakeview District.  The problems outlined here also are a specific part of the reason why Amicus so strongly disagree with Plaintiffs' claims that the BLM should reconsider or adapt its management approach by being required to amend or reconsider the management strategy encompassed in the challenged

Lakeview RMP.

The BLM has, to date, declined Plaintiffs' request to drastically alter its management approach for the Lakeview District's lands, and has continued to manage these lands for multiple uses, including grazing. However, Plaintiffs now seek to usurp BLM's discretion concerning management of these public lands and to impose their own management approach through the court system. This brief explains why the law does not support Plaintiffs' arguments for such an approach in this case. No matter how ardently Plaintiffs feel that grazing should be removed and defacto WSAs created, and no matter how many times Plaintiffs make arguments to Oregon federal court judges in an effort to modify management of the public lands through claims related to ONDA's wilderness characteristic inventories,[1] Plaintiffs cannot compel the courts to adopt an interpretation of the law that conflicts with the plain language of the statutes at issue.

The statutes at issue in this case provide a basic outline of the legal obligations actually applicable to the BLM with regards to inventories of resources and management of the public lands. The case law pertaining to these issues is sparse. (Notably, even though there is limited case law, Plaintiffs do not mention or attempt to distinguish case law that dismisses claims identical to those they have made in this case. *See* ONDA v. BLM, 2005 WL 711663.) Thus, the statutes are an important guide for determining BLM's duties in this case. Plaintiffs' approach to the issues in this case does not comport with the plain language of the statutes and would require BLM to do exceedingly more than required by Congress, and to do so at the detriment of the public who utilize the lands at issue. For these reasons, Plaintiffs' Motion for Summary Judgment should be denied in full.

---

[1] Note that this lawsuit is just one of four filed by ONDA and other associated parties, in which Plaintiffs have made essentially the exact same arguments and claims. *See* Ore. Natural Desert Ass'n v. Shuford et al, Oregon District Court, CV 06-00242-AA; Ore. Natural Desert Ass'n v. Rasmussen, 451 F. Supp. 2d 1202 (D. Or. 2006); Ore. Natural Desert As'n v. Bureau of Land Management, 2005 WL 711663, (D. Or., March 29, 2005) (hereafter "ONDA v. BLM").

## STATUTORY AND REGULATORY FRAMEWORK

### I.  National Environmental Policy Act.

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4361, requires agencies to prepare an environmental impact statement ("EIS") for all major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C).  This requirement imposes a purely procedural, as opposed to substantive duty, on the BLM. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).  Under NEPA's implementing regulations, the BLM is directed to prepare a draft EIS, which is circulated to the public and other agencies for comments, and then to prepare a final EIS responding to those comments.  40 C.F.R. § 1502.9(a)-(b).  If significant new circumstances or information bearing on the proposed federal action arises during the course of this process, the BLM is instructed to prepare a supplement to the draft or final EIS.  40 C.F.R. § 1502.9(c).  During the course of its analysis, the agency must succinctly describe the environment affected by its action, 40 C.F.R. § 1502.15, and the purpose and need for its action, 40 C.F.R. § 1502.13.  The EIS must also describe reasonable alternatives to the proposed action, including a "no action" and a "preferred action" alternative.  40 C.F.R. § 1502.14.

### II.  Federal Land Management and Policy Act.

The Federal Land Management and Policy Act ("FLPMA"), 43 U.S.C. §§ 1701-1784, requires the BLM to manage public lands under the principles of multiple use and sustained yield, and to "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(a), (b).  Multiple use is defined by FLPMA to mean the "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people. . . ."  43 U.S.C. § 1702(c).  Multiple use management involves the "use of the land for some or all of these resources," it also means "the use of some land for less than all of the

AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

resources." <u>Id</u>.  The BLM is instructed to manage the public lands and their resources so that they are "utilized in a combination of *balanced and diverse resource uses* that take into account the long-term needs of future generations for *renewable and nonrenewable resources*, including, but not limited to recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values" and to do so "without permanent impairment of the productivity of the land and the quality of the environment."  <u>Id</u>.(emphasis added).

The principle of sustained yield is equally important in the BLM's management of public lands.  43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands under principles of multiple use and sustained yield. . . .").  The principle of sustained yield is specifically focused on the "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." 43 U.S.C. § 1702(h).

Thus, FLPMA instructs the BLM to manage for a "combination of balanced and diverse resource uses."  43 U.S.C. § 1702(c).  It also requires that the BLM manage the public lands for grazing, timber, and other such uses in accordance with the "sustained yield" management principle.  43 U.S.C. §§ 1702(h), 1732(a).

FLPMA further requires that "In managing the public lands, the Secretary shall, by regulation or otherwise, take any action necessary to prevent the unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).  This instruction is given along side the requirement to manage for multiple use and sustained yield.  43 U.S.C. § 1702(h).

Finally, FLPMA instructs the BLM to "develop, maintain, and when appropriate, revise land use plans. . . ."  43 U.S.C. § 1712(a).  The BLM calls these plans resource management plans (RMPs), and uses them to provide broad direction as to future management actions.

43 C.F.R. § 1601.0-2. RMPs outline resource condition goals, allowable resource uses and

levels, program constraints, general management practices, and monitoring requirements.

43 C.F.R. § 1601.0-5(n). RMPs are to provide for management consistent with the principles of

multiple use and sustained yield. 43 U.S.C. § 1732(a).


### III. Public Rangelands Improvement Act.

The Public Rangelands Improvement Act (PRIA), 43 U.S.C. §§ 1901-1908, provides

guidance, along with FLPMA, concerning the management of grazing on public lands under

BLM's jurisdiction. Of particular interest in this matter is PRIA's requirement to conduct an

inventory of range conditions and record of trends of range conditions on the public rangelands

in conjunction with the FLPMA Section 1711 inventory. 43 U.S.C. § 1903(a). Also important is

the direction to manage the public rangelands in accordance with the Taylor Grazing Act,

FLPMA, and PRIA. 43 U.S.C. § 1903(b).

### IV. The Taylor Grazing Act and FLPMA.

The Taylor Grazing Act of 1934, 43 U.S.C. §§ 315-315r, also outlines specific provisions

for management of grazing on public lands. It set up the current grazing permit system, and

outlined the system for the initial allocation of grazing permits, on which Amicus relied to

develop and now rely on to maintain their ranching operations. 43 U.S.C. § 315b. Grazing

permits are issued for 10 years, must not be arbitrarily suspended or cancelled, and may

incorporate direction from an allotment management plan ("AMP"). 43 U.S.C. §§ 315b;

43 U.S.C. § 1752(a), (d); <u>Anchustegui v. Dep't of Agriculture</u>, 257 F.3d 1124, 1128-29 (9th Cir.

2001) (grazing permits cannot be revoked without notice and an opportunity to be heard).

AMPs are not required by the Taylor Grazing Act, FLPMA or PRIA. 43 U.S.C.

§ 1752(d).  However, to the extent that they are developed by BLM, they must be developed in consultation, cooperation, and coordination with the permittees that utilize the allotment.  Id. AMPs are allotment-specific plans "tailored to the specific range condition of the area" and are meant to improve the range condition of the lands involved.  Id.

**V.  Wilderness Areas and Wilderness Study Areas (WSAs).**

In 1964, Congress enacted the Wilderness Act, 16 U.S.C. §§ 1131-1136.  This statute generally defines wilderness as areas that are primarily affected by forces of nature, have outstanding opportunities for solitude or primitive recreation, and are at least 5,000 acres in size. 16 U.S.C. § 1131(c).   Only Congress has authority to designate an area as a wilderness. 16 U.S.C. §1132(b), (c).

As part of the Wilderness Act, and again in FLPMA, the Secretary of Interior was instructed to review roadless areas of 5,000 acres or more, as well as roadless islands of the public lands, to determine whether they had wilderness characteristics and should be recommended to Congress for designation as wilderness areas.  43 U.S.C. § 1782(a).  FLPMA required that the Secretary of Interior complete this review by 1991 (within 15 years of the enactment of FLPMA) and report his recommendations of potential wilderness areas to the President.  Id.  The areas studied by the Secretary during this time have come to be called Wilderness Study Areas or WSAs.  Until Congress reviews the Secretary's proposed wilderness designations (or WSAs), FLPMA requires that the lands within the WSAs be managed so as to not impair the suitability of such areas for preservation as wilderness.  43 U.S.C. § 1782(c). Notably, however, FLPMA explicitly subjects this requirement to the continuation of grazing and mining uses which are allowed to continue to the same extent as they existed on October 21,

Page 8     AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1976, until Congress has conducted its review.  Id.

As noted by in the BLM's brief, BLM-administered lands in Oregon underwent this wilderness review and documented its results in a 1989 Oregon Final Wilderness EIS and 1991 Wilderness Study Report for Oregon.  *See* Memorandum in Support of Defendants' Cross-Motion for Summary Judgment Pursuant to the APA and In Response to Plaintiffs' Motion for Summary Judgment ("BLM's Memo"), p. 7.  The Lakeview RMP/ROD explains that BLM does not have authority to designate new WSAs at this time, and ONDA concedes as much in its April 1, 2005 letter requesting that the BLM designate ONDA's proposed WSAs as other special management areas (i.e., an area of critical environmental concern) until BLM regains authority to designate WSAs.  AR Tab 3-3, ONDA-Lakeview Wilderness Inventory Recommendations, p. iii.

## STANDARD OF REVIEW

None of the aforementioned statutes provide a private right of action.  As such, Plaintiffs style their NEPA, FLPMA, PRIA and Taylor Grazing Act claims as claims under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706.  *See* Complaint (Docket No. 1). In assessing such claims, the APA provides that the standard of review is whether an agency has acted in a manner that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.  5 U.S.C. § 706(2)(A).  Under this standard, courts are instructed to provide significant discretion to the agency's decision, determining only whether the agency based its decision on the relevant factors and did not make a clear error of judgment.  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).  Courts are further instructed not to substitute their judgment for that of the agency in these cases.  Bowman Transp., Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285 (1974); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).  Thus, the courts have a limited scope of review in this type of

case.

**ARGUMENT**

Plaintiffs have made a number of claims challenging the BLM's Lakeview RMP and the Beaty Butte Allotment Management Plan ("AMP"). Plaintiffs claim that BLM must prepare/update a wilderness resource inventory in order for its Lakeview RMP to comply with FLPMA's requirements and NEPA's "hard look" standards. Plaintiffs also claim that the BLM's Final EIS for the Lakeview RMP did not consider an adequate range of alternatives with regards to grazing. Finally, Plaintiffs' claim that the BLM failed to assess, as part of the Lakeview RMP, whether the lands at issue are chiefly valuable for grazing and that the BLM failed to perform an inventory of range conditions pursuant to PRIA. For the reasons articulated below, each of these claims lacks credible factual and/or legal support, and fails upon minimal scrutiny. In addition, a number of Plaintiffs claims are non-justiciable or untimely filed and technically should be dismissed without any further consideration by this Court.[2]

**I. BLM Had No Duty to Update Inventories Prior to Its Adoption of the Lakeview RMP.**

    **A. The Lakeview RMP's Validity Does Not Rest on Whether the BLM Has Prepared An Updated Inventory**

Plaintiffs allege that the BLM has violated both FLPMA and NEPA by implementing the Lakeview RMP without first updating the inventory required by Section 1711 of FLPMA. 43 U.S.C. § 1711(a). In particular, Plaintiffs want the BLM to update the information in this inventory that pertains to wilderness characteristics (effectively this is a request to update the prior WSA inventory). However, upon a quick review of the statute, it is fairly obvious that the

---

[2] The BLM has already done a very adequate job in addressing the justiciability of Plaintiffs' claims. In an effort not to duplicate briefing and to provide the Court with other helpful information, Amicus have not repeated these arguments or addressed them in the same detail as addressed by Defendant BLM. Nonetheless, Amicus agree with Defendant BLM's position on these issues and adopts their arguments and incorporates them herein. *See, e.g.*, BLM's Memo, pp. 14-20.

BLM is not required to update the Section 1711 inventory as part of the RMP process, nor is an

update necessary for the BLM to appropriately manage the public lands under its jurisdiction.

FLPMA requires the Secretary of the Interior (through the BLM) to prepare and maintain

an inventory of all public lands and their resources and values.    43 U.S.C. § 1711(a).

Specifically, FLPMA states:

> The Secretary shall prepare and maintain on a continuing basis an inventory of all
> the public lands and their resources and other values (including, but not limited to,
> outdoor recreation and scenic values), giving priority to critical environmental
> concerns.    This inventory shall be kept current so as to reflect changes in
> conditions and to identify new and emerging resources and other values.

Id.  If FLPMA said no more, then Plaintiffs might have a legitimate basis for asserting their

inventorying claim against the BLM.[3]  However, the next sentence is a definitive message from

Congress that this inventorying duty <u>does not</u> impose a corresponding duty to undertake any

particular management or use of public lands.

> The preparation and maintenance of such inventory or the identification of such
> areas *shall not*, of itself, change or prevent change of the management or use of
> public lands.

43 U.S.C. § 1711(a) (emphasis added).  Congress could not have been more clear that it <u>did not</u>

<u>intend to impose any requirement</u> on the BLM to use the inventory of public lands and

resources/values in its management of the public lands.  Plaintiffs' claims that the BLM must

have an inventory ring hollow in light of this clear statutory language.  If the statute does not

impose a duty to utilize the inventory for BLM's management of the public lands, then Plaintiffs

---

[3] This court would not, however, have jurisdiction to hear such claims.  <u>Norton v. Southern Utah</u>
<u>Wilderness Ass'n</u>, 542 U.S. 55 (2004) (<u>SUWA</u>).  The U.S. Supreme Court has determined that
courts do not have the authority to oversee the manner and pace of agency compliance
with broad congressional directives, such as BLM's inventorying duties.  <u>Id</u>. at 66-67; *see also*, <u>Ore.</u>
<u>Natural Desert As'n v. Bureau of Land Management</u>, 2005 WL 711663, *4 (relying on <u>SUWA</u> to
make the same conclusion).

Page 11    AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT

have no claim that the BLM has violated FLPMA by failing to update this informational inventory prior to adopting the Lakeview RMP.

In the very next section of FLPMA, Congress expands upon this language and makes it even more clear that it never intended to require that the BLM update the Section 1711 inventory with information on wilderness resources or any other type of public land resource before it prepared a resource management plan. Section 1712 requires the Secretary of the Interior, through the BLM, to "develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C.§ 1712(a). Yet, with regards to the Section 1711 inventory and land use plans, Congress explained:

> In the development and revision of land use plans, the Secretary shall – . . .
>
> (4) rely, *to the extent it is available*, on the inventory of public lands, their resources, and other values.

43 U.S.C. § 1712(c)(4) (emphasis added). This language leaves no doubt that Congress expected that BLM would and could prepare a valid land use plan without a current inventory of public lands or resources. Id.

Taken in the context of this case, the statute simply does not support Plaintiffs' claim that the BLM *must* update its inventory before preparing an RMP or in order to appropriately manage the public lands. Plaintiffs have no basis to claim that the Lakeview RMP is somehow invalid due to the alleged failure of BLM to update the Section 1711 inventory with wilderness information.

Magistrate Judge Jelderks addressed this same issue when Plaintiffs brought an identical claim against the BLM with regards to the Southeast Oregon Resource Management Plan ("SEORMP"). ONDA v. BLM, 2005 WL 711663. Judge Jelderks dismissed Plaintiffs' claim

Page 12   AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

that FLPMA imposes a duty for the BLM to prepare an updated inventory, simply stating that "Plaintiffs have not shown that the BLM is legally required to perform a wilderness inventory." Id. at *4. Judge Jelderks further stated that "because the preparation of WSA inventories does not by itself change the management or use of public lands, the WSA claim here is not viable." Id.

Judge Mossman arrived at the same conclusion in Rasmussen, 451 F. Supp. 2d, 1201, 1214-1215. In his review of an identical claim by ONDA in regards to the East-West Gulch Project within the Beaty Butte Allotment, Judge Mossman determined that, with regards to the issue of maintaining a current inventory of wilderness values, Plaintiffs had no right of action against BLM under FLPMA.[4] Id.

Furthermore, in looking at and giving meaning to each term in FLPMA, the act of updating an inventory can not have any bearing on whether or not the BLM's management of public lands is preventing "unnecessary or undue degradation." *See* Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memo"), p. 16 (arguing that the BLM did not "have a basis to determine whether the proposed uses would cause unnecessary or undue degradation because it does not have a current inventory"). Again, updated inventories are not necessary for the BLM to appropriately manage public lands because the preparation or maintenance of an inventory does not of itself change the management or use of public lands. 43 U.S.C. §1711(a). Thus, the BLM can manage the public lands under its jurisdiction in the Lakeview District so as to prevent undue or unnecessary degradation absent an updated

---

[4] Judge Mossman instead looked to NEPA as the basis for requiring the BLM to prepare an updated inventory. Rasmussen, 451 F. Supp. 2d at 1213. The problem with this position, particularly given Judge Mossman's reject of Plaintiff's FLPMA claim, is addressed in Section II.B. below.

inventory.

For all of these reasons, this Court simply need go no further than the basic terms of FLPMA to see that Plaintiffs' desire to have an updated inventory is <u>not required by</u> and is <u>contrary to</u> the plain terms of FLPMA. The BLM's adoption of the Lakeview RMP without an updated inventory does not violated FLPMA.

**B. NEPA Does Not Create An Alternative Route for Plaintiffs to Force the BLM to Perform Inventories Not Required by FLPMA**

Plaintiffs' argument that BLM has violated NEPA's "hard look" standard is premised on <u>Rasmussen</u>, 451 F. Supp. 2d 1202. Plaintiffs claim that "In order to satisfy NEPA's 'hard look' requirement, the BLM must analyze the impacts of its proposed actions on the wilderness resource. . ." and cite to <u>Rasmussen</u> to support this statement. *See* Plaintiffs' Memo, p. 21. This argument bears questioning for three reasons: The <u>Rasmussen</u> conclusions concerning NEPA are based on an interpretation of FLPMA that is inconsistent with the plain language of that statute; <u>Rasmussen</u> is in direct conflict with an earlier decision from the U.S. District Court of Oregon by Magistrate Judge Jelderks, <u>ONDA v. BLM</u>, 2005 WL 711663; and <u>Rasmussen</u> is factually distinguishable from this case.

FLPMA's "inventorying duty" is key to both the <u>Rasmussen</u> and <u>ONDA v. BLM</u> decisions as they pertain to the question of whether the BLM took a "hard look" at the proposed action's impact on wilderness resources or values. In <u>Rasmussen</u>, plaintiff demanded that the BLM re-inventory the lands within the East-West Gulch Projects area for wilderness resources. <u>Rasmussen</u>, 451 F. Supp. 2d at 1211-1212. The last WSA inventory had been performed in 1992. <u>Id</u>. at 1212. BLM responded that it had previously assessed wilderness characteristics and that none were present or would be significantly affected by the proposed project. <u>Id</u>.

The <u>Rasmussen</u> decision found that the BLM violated NEPA's "hard look" standard under these circumstances because the BLM's reliance on the 1992 inventory was "not consistent with its statutory obligation to engage in a continuing inventory so as to be current on changing conditions and wilderness values." <u>Id</u>. at 1213. In other words, <u>Rasmussen</u> found a violation of NEPA because the court interpreted FLPMA to require compliance with an inventorying duty as it managed public lands. For whatever reason made, there can be no doubt that this position, namely that maintaining a continuing inventory is required by FLPMA in order for the BLM to manage public lands, conflicts with the plain language of FLPMA. *See supra* Section I.A. (In fact, Judge Mossman explicitly agrees with this interpretation of FLPMA later in his decision. <u>Rasmussen</u>, 451 F. Supp. 2d at 1215). Congress was clear that whether the BLM was creating an AMP, RMP, or taking any other action, it could and should manage public lands without an updated Section 1711(a) inventory. 43 U.S.C. § 1711(a).

When the purpose and timing of the inventorying duty is correctly understood, the precondition for <u>Rasmussen</u>'s conclusion that NEPA was violated by BLM's decision not to create a new WSA analysis or inventory, is fully absent. And, the <u>Rasmussen</u> conclusion is deprived of meaningful significance in the context of this case.

A better reasoned analysis of the duty imposed by NEPA is that made by Judge Jelderks in <u>ONDA v. BLM</u>, 2005 WL 711663. <u>ONDA v. BLM</u> is consistent both with FLPMA and NEPA, and should be followed here.

In <u>ONDA v. BLM</u>, the plaintiffs argued that the BLM had last addressed wilderness values in a 1989 Wilderness Study Area ("WSA") analysis, that the BLM had "completely failed to collect and discuss" wilderness information in the EIS for the SEORMP, the agency action at issue in the case, and that this violated NEPA's "hard look" standard. <u>ONDA v. BLM</u>, 2005 WL

711663, at *4. Judge Jelderks analyzed plaintiffs' arguments and determined that BLM had no obligation to revisit the 1989 WSA analysis when it adopted the SEORMP because "the preparation of WSA inventories does not by itself change the management or use of public lands." Id. Notably, Judge Jelderks' NEPA decision specifically refers to FLPMA's clear intent that the preparation or maintenance of inventories is not, of itself, to change (or prevent change) of the management or use of public lands. 43 U.S.C. § 1711(a); ONDA v. BLM, 2005 WL 711663, at *4.

Thus, in the face of the plaintiffs' arguments that BLM must specifically analyze the impacts of its proposed SEORMP on the wilderness resource to comply with NEPA, Judge Jelderks referred to the language of FLPMA, which he found did not require inventories or analysis sought by plaintiffs. Id. And, Judge Jelderks determined, again by looking first at the plain language of FLPMA, that the BLM had not failed to take a "hard look" at the wilderness resource simply because the BLM had not assessed wilderness values on non-WSA roadless area during its planning process. Id.

Here, Plaintiffs do not even attempt to rectify the conflicts inherent in Rasmussen's reasoning. In addition, Plaintiffs simply ignore the holding and findings in ONDA v. BLM. This is particularly problematic given the fact that it is only the position in ONDA v. BLM that is consistent with the language of FLPMA.

Furthermore, Plaintiffs do not attempt to address the fact that in the Rasmussen case, the BLM was in a different factual position than that at issue here. There, ONDA's proposed WSA inventory had been delivered before the BLM adopted the project at issue. Rasmussen, 451 F. Supp. 2d at 1202, 1208. Here, of course, ONDA did not deliver its proposed WSA inventory until well after the Lakeview RMP was complete. Thus, Plaintiffs cannot take a position that

was very important to the final decision made in <u>Rasmussen</u>, namely, that BLM failed to consider information it had available to it during the review process. <u>Rasmussen</u>, 451 F. Supp. 2d 1202, 1212-1213 (referring to and relying on a Northern District of California case that criticized BLM for failing to address/update its information when that information was readily available to it). Thus, unlike the situation in <u>Rasmussen</u>, here, ONDA did not submit its inventory and BLM did not fail to adequately review that information as it conducted its analysis. <u>Id</u>. at 1212-1213.

Taken altogether, <u>Rasmussen</u> is generally inapposite here, as it is both factually distinguishable and legally inconsistent with other case law and the plain language of FLPMA. Plaintiffs' claim that BLM should have conducted a WSA inventory as part of its NEPA analysis cannot be supported by <u>Rasmussen</u>. In addition, given the language of FLPMA and the determination of Judge Jelderks in <u>ONDA v. BLM</u> as to how FLPMA influences the "hard look" duty of NEPA, Plaintiffs' have no basis to claim that, here, the BLM must re-analyze the wilderness resource allegedly present within the Lakeview RMP planning area in order to satisfy NEPA's "hard look" requirement. Plaintiffs' NEPA "hard look" arguments have already been soundly rejected by Judge Jelderks: They should also be rejected here.

### C. BLM's Planning Process Involved Consideration of the Affected Environment, Including Specific Consideration of Roads, Recreational Sites, and Natural Areas

In addition to the issues addressed above, Plaintiffs inventorying claims are problematic in that they base them on a "hard look" argument that takes an unusual view of what the "affected environment" means. Through this argument, Plaintiffs creatively seek to find an obligation that does not exist, namely, that BLM can only fulfill NEPA's requirements if it specifically looks for (inventories) wilderness characteristics within the planning area during the

Page 17    AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

planning process.  The applicable NEPA regulations explain that the BLM is to "succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration."  40 C.F.R. § 1502.15.  This requirement plainly does not create a duty that the BLM specifically seek out and find wilderness-type characteristics within the planning area.  It simply means that the BLM must review and describe the condition of the resource planning area.  BLM has met this obligation.

Given Plaintiffs' heightened sensitivity to the BLM's review of roadlessness, naturalness, and opportunities for solitude or primitive recreation (all of which are characteristics of wilderness areas), Amicus will provide a few examples of BLM's review of the "affected environment" as it pertained to roads, naturalness and recreation opportunities within the Lakeview RMP planning area.

Collecting information so as to perform an analysis of the impacted environment and potential alternatives for the proposed action begins early on in the development of a resource management plan.  43 C.F.R § 1610.4-4 ("The Field Manager. . .will analyze inventory data and other information available to determine the ability of the resource area to respond to identified issues and opportunities").  Here, the BLM began collecting information about the resources, uses, and values in the resource planning area at least as early as July 2000, when it published the Summary of the Analysis of Management Situation ("AMS") and the Subbasin Review ("SBR") (hereafter "Summary of AMS") for the Lakeview resource area RMP.  AR Tab 2-33, Summary of AMS, cover page.  In this document, the BLM looked at opportunities for dispersed recreation throughout the resource area.  AR Tab 2-33, Summary of AMS, 2-22 to 2-23.  Specifically, the BLM noted that most of the resource area is managed as an Extensive Recreation Management Area, which means that the area is managed for undeveloped recreation wherein the visiting

public are "expected to rely heavily on their own equipment, knowledge, and skills while participating in recreation activities."  AR Tab 2-33, Summary of AMS, 2-23, 3-4.  The BLM collected information about opportunities for primitive and developed recreation in the resource area.  *See* AR Tab 2-33, Summary of AMS, 2-23 and Appendix B-6 (primitive and semi-primitive recreation is also important).

The BLM also collected information related to the extent and use of roads throughout the resource area.  AR Tab 2-33, Summary of AMS, 2-30 and 3-5 (approximately 2,500 miles of road on inventory, 150 to 200 miles annually maintained by BLM); AR Tab 2-33, Summary of AMS, Appendix B-3 (use of roads for recreation, BLM, commercial, and public interests, and closure of roads); AR Tab 2-33, Summary of AMS, Appendix B-7 (regarding roads for access to grazing allotments, range projects, and recreation).

Finally, the BLM also looked for areas of naturalness within the resource area.  For example, the BLM evaluated rivers and streams to determine whether they should be classified as wild, scenic, or recreation rivers.  AR Tab 2-33, Summary of AMS, 2-21 to 2-22 (noting particular rivers or creeks that were reviewed for naturalness).  The BLM also incorporated information from a 1996/1997 evaluation of the condition of 113 miles of streams in the Lakeview resource area.  AR Tab 2-33, Summary of AMS, 2-9.  That analysis found that 75% of the streams were in proper functioning condition.  Id.  The BLM determined the types and general spread of noxious weeds in the planning area.  AR Tab 2-33, Summary of AMS, 2-10. The BLM also reviewed the condition of the forest and woodlands in the SBR area for the past 50 to 100 years.  AR Tab 2-33, Summary of AMS, 2-17.  All of these analyses and collections of information address, in one way or another, the naturalness of the public lands within the resource planning area.

The BLM further reviewed and included information on protections of special management areas. It reviewed previously designated and considered additional designations of areas of critical environmental concern ("ACECs") and research natural areas ("RNAs"). AR Tab 2-33, Summary of AMS, 2-18 to 2-20. It also reviewed its 1989 study of potential wilderness areas. AR Tab 2-33, Summary of AMS, 2-20. Twelve wilderness study areas, totaling 423,270 acres, were considered in that study. Although only nine were recommended for wilderness designation, the BLM is continuing to provide special management of for all twelve areas (and all 423,270 acres), *including those not determined to have wilderness characteristics*, until Congress acts one way or another on BLM's recommendations. Thus, the BLM considered naturalness and how it was protected when it compiled the information it relied on to develop the Final EIS and Lakeview RMP.

Given the extent of the information collected and resources analyzed, it is difficult to understand how Plaintiffs could feel comfortable advancing the position that BLM failed to collect information as to the natural environment within the resource planning area. It also puts to rest any claim that this case is like the situation in <u>Center for Biological Diversity v. Bureau of Land Management</u>, 422 F. Supp. 2d 1115 (N.D. Cal. 2006), a case Plaintiffs cite to, but the holding of which is not binding on this Court in any case. In <u>Center for Biological Diversity</u>, the court's key concern was that the BLM ignored resource inventories prepared by the state and by the BLM itself, during its planning process. <u>Id</u>. at 1163-1164. Here, however, the BLM included a wealth of information on the entire affected environment in its planning documents, including information it had generated and information from the public. *See, e.g.,* AR Tab 2-33, Summary of AMS, 2-18 to 2-19, (regarding BLM's consideration of nominations for ACECs proposed by the BLM and by ONDA). BLM has not ignored information it created, nor has it

ignored information made available to it by others.  (As noted previously, ONDA's review of wilderness characteristics did not even begin until the BLM had completed this process and issued the Lakeview RMP).  This situation is not like that in <u>Center for Biological Diversity</u>. The BLM considered all relevant information available to it as it complied with NEPA.

After collecting the information discussed above, the BLM obtained and outlined even more information about the resources within the planning area in Chapter 2 (Affected Environment) of the EIS.  AR Tab 2-26, pp. 2-1 to 2-104; *see, e.g.,* AR Tab 2-26, pp. 2-84 to 2-88 (providing a much more extensive analysis of the recreation resource).  Then, the BLM analyzed the impact of its proposed alternatives on a variety of uses and resources.  *See* AR Tab 2-26, Lakeview Draft RMP/Final EIS, Chapter 3.

The record quickly puts to rest any claim by Plaintiffs that the BLM failed to determine baseline conditions (the affected environment) within the planning area so that the BLM could perform the necessary analysis of impacts to the affected environment required by NEPA.  That an area is left open to grazing, off-road vehicles, mineral leasing, or even to access by vehicles for recreation, *see* Plaintiffs' Memo, p. 25, does not mean that BLM did not compile all available information concerning the environment affected by its decision.  The BLM has the discretion to determine which multiple uses to allow in any particular area.  43 U.S.C. §1732(a), §1702(c) (multiple use means balanced and diverse resource use); <u>SUWA</u>, 542 U.S. at 66 (courts cannot compel or dictate what compliance with broad mandates should look like). Statements implying that BLM ignored the impact of its action on the environment or that it did not collect a great amount of information about the resources within the planning area, are easily belied by evidence from the administrative record.

Plaintiffs advance no theory for requiring the BLM to adopt their particular view of what

the "affected environment" is meant to include, and further cannot dispute the extent of the information BLM collected in order to prepare its analysis of how proposed alternatives impact the affected environment within the planning area. Plaintiffs have not provided the necessary support for their request that this Court require the BLM to prepare a meaningless inventory re-start it's multi-year planning process.

In sum, Plaintiffs' FLPMA and NEPA claims provide no basis for a finding that the BLM's Lakeview RMP or Final EIS should fail for lack of a wilderness resource inventory. Plaintiffs claims should therefore be dismissed.

## II.    BLM's Alternatives Analysis Fulfilled the Requirements of NEPA:    BLM Fully Analyzed Grazing Levels.

Plaintiffs contend that the BLM failed to consider a reasonable range of alternatives with respect to allocated land areas and levels of livestock grazing. *See* Plaintiffs' Memo, p. 28. The record demonstrates that this contention lacks merit.

### A.  BLM Studied a Sufficient Range of Alternatives for Livestock Grazing

The Court reviews an agency's "range of alternatives under a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1160 (9th Cir. 1998) *quoting* Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir. 1997). The extent of the alternatives considered is driven by the nature and scope the proposed action. Presidio, 155 F.3d at 1160. Thus, "[w]hen the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." Rasmussen, 451 F. Supp. 2d 1202, 1213, *quoting* City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986) (per curiam). In addition, the BLM does not need to "discuss alternatives similar to alternatives considered, or alternatives which are 'infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area.'" N. Alaska Envtl. Ctr. v. Kempthorne,

457 F.3d 969, 978 (9th Cir. 2006). Thus, the BLM's consideration of alternatives is adequate if the BLM "considers an appropriate range of alternatives, even if it does not consider every available alternative." Headwaters, Inc. v. BLM, 914 F.2d 1174, 1181 (9th Cir. 1990).

Here, one of BLM's management plan goals is to "Provide a predictable, sustained flow of economic benefits within the capability of the planning area ecosystem." AR Tab 2-26, Lakeview Draft RMP/Final EIS, pp. 3-31. This is accomplished, in part, by BLM's goal to "Provide for a sustainable level of livestock grazing consistent with other resource objectives and land-use allocations." AR Tab 2-26, Lakeview Draft RMP/Final EIS, pp. 3-38.

As noted by Plaintiffs, "the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in the EIS." Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 866 (9th Cir. 2004). The BLM was well within the requirements of FLPMA and the Taylor Grazing Act in developing its goal to provide for predictable, sustained economic benefits from the public lands at issue and to do so by providing for sustainable level of livestock grazing throughout the planning area. BLM manages public lands under the principles of multiple use and sustained yield. 43 U.S.C. § 1732(a); Headwaters, 914 F.2d 1174, 1182 (recognizing that the BLM is directed "to manage the public lands on a multiple use basis making the most judicious use of the land for some or all of the public land resources…"). "Multiple use management requires 'striking a balance among many competing uses to which land can be put, "including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.""' Rasmussen, 451 F. Supp. 2d at 1211. The determination of which use is appropriate for particular lands is left to the discretion of the BLM, and the courts disclaim authority to compel an agency to modify such a determination. Headwaters, 914 F.2d at 1182-1183; SUWA,

542 U.S. at 66; 43 U.S.C. § 1732 (a).  Thus, the BLM's goal to manage the Lakeview planning area for sustainable grazing  in order to accomplish its goal of a predictable, sustained flow of economic benefits is fully within the scope of its statutory objectives.

BLM considered a reasonable range of alternatives for managing grazing considering its goals.  *See* AR Tab 2-33, Lakeview RMP/ROD, p. 3 (all alternatives were designed to meet the RMP management goals).  BLM was not required to examine an endless list of alternatives which would not achieve its purposes of providing a predictable, sustained flow of economic benefits and a sustainable level of livestock grazing.  *See* Kempthorne, 457 F.3d at 978 (the BLM need not discuss alternatives that are inconsistent with the basic policy objectives for the management of the area).

Plaintiffs claim that BLM was required to consider other alternatives to accomplish FLPMA's directive to prevent "undue or unnecessary degradation" in the management of the public lands.  This position is based on the faulty premise that the term "undue or unnecessary degradation" means "no" degradation.  It also ignores the requirement to give deference to the BLM's discretion in exercising its duties under FLPMA.

The phrase "undue or unnecessary degradation" does not necessarily require the absence of degradation.   The context in which Congress used the term "unnecessary or undue degradation" demonstrates as much.  The very last sentence of Section 1732(b) of FLPMA reads as follows:

> In managing the public lands, the Secretary shall, by regulation or otherwise, take any action necessary to prevent the unnecessary or undue degradation of the lands.

43 U.S.C. § 1732(b).  However, this language cannot be read outside of the context of the requirement that the BLM manage public lands for multiple use and sustained yield.  43 U.S.C.

§ 1732(a).  In other words, this phrase cannot be read so as to make Congress' direction to manage for multiple use and sustained yield meaningless.  A logical reading of this provision is that Congress understood that undue and unnecessary degradation would occur even when BLM provided for the "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands."  43 U.S.C. § 1702(h) (definition of sustained yield).

In fact, the very use of the terms "undue" and "unnecessary" as opposed to use of the term "no" degradation, implies that Congress intended to allow for some degradation as the BLM managed the public lands.  And, frankly, this makes sense given BLM's duties to manage for "diverse resource uses that take into account the long-term needs of future generations for renewable and nonrenewable resources" and for "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources."  43 U.S.C. § 1702(c), (h).  In other words, Congress intended to allow the use of resources on the public lands, but simply instructed that degradation (if any) not be unnecessary or undue in the context of allowing those uses.  Thus, assuming that grazing could result in some degradation of the public lands, a position that Amicus dispute to the extent that grazing is occurring in a sustainable manner as required by the Lakeview RMP, all of the alternatives could include extensive acres allotted to grazing and still address the BLM's duty to prevent unnecessary or undue degradation.

The BLM has significant discretion in determining what is unnecessary or undue degradation.  In SUWA, the Supreme Court reviewed whether the BLM was violating the non-impairment standard for WSAs by authorizing off-road vehicle (ORV) use within WSAs. SUWA, 542 U.S. at 65-67.  In analyzing this issue, the Supreme Court determined that it could

require the BLM to comply with the non-impairment mandate, but could not instruct the BLM on any particular manner of how it should comply with the mandate. Id. at 66. Similarly, here, the Court can require the BLM to comply with FLPMA's "undue or unnecessary degradation" standard, but it cannot direct what such compliance will look like. To do so would result in "undue judicial interference" and "judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." Id. at 66.

The plain language of the statute, which allows for degradation, has been confirmed by the Ninth Circuit. The determination to allow the BLM to exercise its discretion, may legally result in what Plaintiffs may consider to be environmental damage. Sierra Club v. Clark, 756 F.2d 686, 691-692 (9th Cir. 1985) (finding it reasonable for the Secretary to authorize ORV use in a particular portion of the planning area, even though it was concededly damaging the environment, so long as the planning area as a whole was in compliance with the multiple use and no "unnecessary or undue degradation" language of FLPMA). Thus, if the BLM has determined that authorization of grazing will not generally result in "unnecessary or undue degradation," then the BLM has not failed to comply with the terms of FLPMA by adopting management plan goals that provide for sustainable grazing throughout the planning area.

Again, with this background in mind, it is not arbitrary or capricious for the BLM to limit the scope of alternatives to only those that are reasonably calculated to achieve the management objections of the Lakeview RMP. Thus, BLM does not violate NEPA by choosing not to craft additional alternatives that incorporate grazing levels that would not provide for a predictable, sustainable flow of economic benefits from the public lands. Such efforts would be fruitless and unreasonable given the BLM's stated management goals. City of Angoon, 803 F.2d 1016,

1021-22 ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").

BLM considered five alternatives in deciding how much land to exclude from livestock grazing:  A, the "no action" alternative; B, the commodity production alternative, which emphasized production of commodities such as mining, grazing, commercial recreation, and timber harvesting; C, the active restoration alternative, which would have constrained and potentially excluded commodity production in certain areas; D, the preferred alternative, which balanced the multiple uses of public lands by providing for a sustainable level of commodity production while protecting, restoring, and enhancing natural values; and E, the passive restoration alternative, which would have excluded all permitted, discretionary uses of the public lands, including grazing, mining, recreation uses requiring permits, and others.  AR Tab 2-33, Lakeview RMP/ROD, pp. 3-4.  These five alternatives are a wide array of alternatives given BLM's goals to provide for a "predictable, sustainable flow of economic benefits" and to provide for sustainable livestock grazing consistent with other resource objectives and public land-use allocation.  AR Tab 2-26, Lakeview Draft RMP/Final EIS, 3-1, 3-38.  BLM had no obligation to consider alternative levels of grazing which it deemed unsustainable or outside its goal of providing for a flow of economic benefits.

Nonetheless, the BLM did consider a wide range of alternatives. Alternative A authorized up to 164,128 AUMs (one AUM or "animal unit month," is the amount of forage needed to feed a mature cow over one month), but was expected to only allow 108,234 AUMs of averaged use given the fact that permittees seldom use their full active preference of AUMs for a variety of reasons, none of which are expected to change.  AR Tab 2-26, Lakeview Draft RMP/Final EIS, 3-38 to 3-39.  Alternative B provided for an increase by 10% of up to 180,541 AUMs of

Page 27    AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

permitted use (this would be an approximate a 40% increase in actual AUMs use).  Id. at 3-39.

In contrast, Alternative C provided for a permanent decrease by 48% of the permitted use, which

would bring use levels down to 86,587 AUMs.  Id.  Alternative E would completely exclude all

commodity production, including grazing, from the public lands at issue (no AUMs).  Id. at 3-40.

Given the goals of providing for a predictable, sustainable flow of economic benefits and for

sustainable grazing, these alternatives certainly provide a reasonable range of possible

approaches for range management within the Lakeview District.  (In fact, one might argue that

Alternative C goes to far, as it would not provide for a sustainable flow of economic benefits, as

this goal relates to grazing, from these public lands.  Clearly, Alternative E, although required by

NEPA, could never accomplish the RMP goals.)

 In addition to the above, the BLM also considered Alternative D, which would provide

for the same levels of AUMs as Alternative A (the "no action" alternative), but would do so in

such a manner as to meet the updated resource management objectives outlined in the new

Lakeview RMP (as opposed to those in the old land use plans).  The BLM also considered four

other alternatives, but eliminated those early in the planning process.  AR Tab 2-33, Lakeview

RMP/ROD, p. 3.

 The BLM is not required to engage in further alternative development or analysis when to

do so would simply be to engage in the same analyses already provided.  Furthermore, as

discussed previously, BLM is not required to engage in the meaningless exercise of developing

and analyzing alternatives that simply do not accomplish its goals.  As the above examples

illustrate, Alternatives A, B, C, D, and E are appreciably different in terms of grazing

management strategies.  And, again, BLM did consider no grazing, status quo grazing, as well as

levels of grazing that were both lower and higher than the status quo levels.  These alternatives

cover a number of different levels of grazing throughout the plan area. It is not necessary to add other intermediate levels of higher or lower grazing to have considered an appropriate range of alternatives. <u>Headwaters</u>, 914 F.2d 1174, 1181. Viewed together, BLM's five alternatives comprise a sufficiently wide breath to satisfy the rule of reason standard and to facilitate a meaningful analysis of environmental effects in light of the BLM's goals for the Lakeview RMP.[5]

Plaintiffs also fault BLM for not considering various levels of forage removal within different grazing level alternatives. *See* Plaintiffs' Memo, p. 35. Plaintiffs' argument fails to take into account that BLM is charged with adopting an RMP covering millions of acres over a significant period of time. It is unreasonable and infeasible to expect such comprehensive plans to address specific issues to the level of detail Plaintiffs demand. In <u>ONDA v. BLM</u>, ONDA advanced the same type of arguments about forage removal levels (measured in AUMs) as it makes here. In response, Judge Jelderks noted that the SEORMP at issue was a comprehensive plan covering millions of acres and could not be expected to address specific issues, such as AUM levels, in detail. <u>ONDA v. BLM</u>, 2005 WL 711663, at *3. Judge Jelderks appreciated the flexibility built into the RMP that allowed the BLM to adjust AUM levels, and found the BLM considered an adequate range of alternatives even though the BLM had determined to maintain current levels of AUM until site-specific analysis identified a need for adjustments. <u>Id</u>. at *2-3. Here, just as was the case in <u>ONDA v. BLM</u>, the Lakeview RMP maintains existing AUM levels, but also provides for flexibility to adjust AUMs as determined appropriate in site-specific

---

[5] Notably, it was not Alternative B, the alternative providing for increased AUMs, that the BLM chose as its preferred alternative. Instead, the BLM chose Alternative D, which provides for balanced management of all public resources, but still accomplishes BLM's goal of providing

analyses.  *See* AR Tab 2-26, Lakeview Draft RMP/Final EIS, 3-38 (describing the BLM's flexible approach to grazing management under the preferred Alternative D).

Thus, the BLM's approach to AUM levels in the Lakeview RMP is nearly identical to that accepted in the SEORMP case.  Furthermore, as demonstrated above, BLM's range of alternatives provides adequate environmental effects assessment in light of its lawful goals.  For these reasons, BLM's grazing alternatives are sufficient and should not be disturbed.

### III.  Plaintiffs' Beaty Butte AMP Claims Fail for Lack of Prosecution and Because The Range of Alternatives Considered by the BLM Was Adequate.

In an effort not to be redundant, Amicus simply note their agreement with the BLM's position that Plaintiffs have not timely brought their claims concerning the Beaty Butte AMP. For this reason alone, Plaintiffs' claims related to the Beaty Butte AMP must be dismissed.

In addition, Amicus note that Plaintiffs' claim concerning the range of alternative considered by the BLM is problematic.  The purpose of the Beaty Butte AMP was to develop a rest-rotation grazing management system as a means of better livestock distribution and use within the allotment.  AR Tab 1-17, Beaty Butte AMP/Final EIS, p. ix.  Thus, the scope of reasonable alternatives that the BLM was required to consider were fairly limited.  City of Angoon, 803 F.2d 1016, 1021-22 ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").  The scope of the alternatives considered included two different rest-rotation grazing systems alternatives; a no change in management alternative; an alternative that eliminating livestock grazing from public lands throughout the allotment; and the chosen alternative, which was a new rest-rotation grazing system that provided for isolated parcels inside and outside the allotment to be managed

---

predictable, sustained flows of economic benefits and sustainable grazing.  Id.; AR Tab 2-26,

AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
DCAPDX_n409777_v1_Amicus_Brief.doc

by the BLM.  AR Tab 1-17, Beaty Butte AMP/Final EIS, p. ix.

A reduction of forage use was not within the goals contemplated for the Beaty Butte AMP, thus, Plaintiffs' claim that forage reductions should have been considered do not comport with the applicable legal standards or factual record in this case.  Plaintiffs' similar alternatives analysis claims relating to the East-West Gulch Projects within the Beaty Butte AMP were rejected when it was found that, on balance, the record reflected that BLM's choice of alternatives was reasonable given the limited purposes of the relevant agency action and the purposes of other, overarching plans, such as the Lakeview RMP.  Rasmussen, 451 F. Supp. 2d 1202, 1213-1214.

Here, the purpose of the Beaty Butte AMP is limited, yet the alternatives are broad and consider a number of different approaches to achieving the goal of developing a rest-rotation grazing management system as a means of better livestock distribution and use within the allotment.   AR Tab 1-17, Beaty Butte AMP/Final EIS, p. ix.   These alternatives are also reasonable given the goal of the Lakeview RMP to provide for a predictable, sustainable flow of economic benefits from the public lands within the Lakeview District.  AR Tab 2-26, Lakeview Draft RMP/Final EIS, 3-38.  Thus, as was the case in Rasmussen, Plaintiffs' claim concerning the range of alternatives considered in the Beaty Butte AMP should be dismissed.

**IV.    Plaintiffs Claims Concerning BLM's Grazing Suitability Analysis and Chiefly Valuable Determinations Are Non-Justiciable.**

The development of a new RMP does not trigger an obligation under the Public Rangelands Improvement Act (PRIA) to create or update an inventory of range conditions. 43 U.S.C. § 1903.  The inventory duty outlined in PRIA is to be conducted and maintained by the BLM as part of the Section 1711(a) inventorying process.  Id.  As explained in detail above,

---

Lakeview Draft RMP/Final EIS, p. 3-40.

AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

DCAPDX_n409777_v1_Amicus_Brief.doc

the duty to update this FLPMA inventory has no particular implications as to the validity of the Lakeview RMP.  *See supra* Section I.A.  Thus, PRIA does not create an independent basis for Plaintiffs to advance their inventorying claims.  43 U.S.C. § 1903(a).

The Taylor Grazing Act (TGA) initially allowed the Secretary of Interior to perform an analysis of whether lands are chiefly valuable for grazing.  43 U.S.C. § 315.  However, contrary to Plaintiffs' arguments, that analysis is not re-triggered by the development of the Lakeview RMP.  In fact, the TGA provides no basis for Plaintiffs to seek such analysis *at any point in time*.  43 U.S.C. § 315.  Section 315 of the TGA authorizes the Secretary of the Interior, "*in his discretion*. . .to establish grazing districts for lands. . .which in his opinion are chiefly valuable for grazing and raising forage crops."  43 U.S.C. § 315 (*emphasis added*).  (It is the BLM and Amicus' position that the "chiefly valuable" analysis required by the TGA was to be and was performed by the Secretary of Interior when the TGA was first adopted and grazing districts were being established.  *See* AR Tab 2-26, Lakeview Draft RMP/Final EIS, 1-6.)

It is wholly within BLM's discretion as to whether and when it will undertake the determinations demanded by Plaintiffs in this case.  Plaintiffs' claims that the BLM must undertake these analyses as part of or prior to the RMP process are unsupported by the plain language of the applicable statutes.

Plaintiffs attempt to characterize their inventorying claims, whether under FLPMA, PRIA or the Taylor Grazing Act, as claims against a final agency action under Section 706(2) of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A).  However, Plaintiffs more accurately seek review of an alleged failure to prepare inventories and an alleged failure to make certain analyses.  These are "failure to act" claims and should be analyzed as such under 5 U.S.C. § 706(1).  To the extent they try to assert that their claims are something other than "failure to act" claims reviewed under APA Section 706(1), Plaintiffs have mispled their claims.

Plaintiffs are, without question, seeking to compel the BLM to act.  Plaintiffs want the BLM to

undertake inventories of wilderness, range and other conditions and to analyze whether certain lands are chiefly valuable for grazing.

"The only agency action that can be compelled under the APA is action legally *required*." <u>SUWA</u>, 542 U.S. 55, 63. As demonstrated above, the Plaintiffs' seek to enforce actions that the BLM is not actually required to take in conjunction with the Lakeview RMP, or in the case of the Taylor Grazing Act claim, not at all. Without more, Plaintiffs' claims cannot proceed.

This is not the first time that ONDA has tried to assert such "failure to inventory claims" and been rebuffed by Oregon federal court judges. In <u>ONDA v. BLM</u>, ONDA made claims based on FLPMA, alleging that the BLM had failed to maintain an inventory of wilderness values. Judge Jelderks found that ONDA had not shown that the BLM was legally required to do what ONDA requested, and dismissed ONDA's claims. <u>ONDA v. BLM</u>, 2005 WL 711663, at *4.

In addition, Plaintiffs' Taylor Grazing Act claims were previously denied by Department of Interiors Administrative Law Judge (ALJ) Harvey C. Sweitzer. AR Tab 1-83. In that instance, the ALJ rejected ONDA's argument, finding that the Secretary's duty to reevaluate the initial land suitability determinations is discretionary, and further, that the Secretary of Interior was not "under an obligation to continually reassess the classification and suitability of public lands to determine whether those lands remain 'chiefly valuable for grazing and raising forage crops.'" AR Tab 1-83 (ALJ November 30, 2005, Order, Case No. OR-010-98-1), p. 8. The same analysis applies here, and taken in conjunction with <u>SUWA</u>, warrants dismissal of Plaintiffs' Taylor Grazing Act claims.

Plaintiffs have failed to show that BLM was legally required to take the actions Plaintiffs'

seek.  Whether asserted under FLPMA, the Taylor Grazing Act, or PRIA, Plaintiffs' claims fail

to meet the threshold requirement wherein they could compel the court to act on these claims.

Thus, these claims should be dismissed.

### <u>CONCLUSION</u>

Amicus respectfully ask that this Court consider the above analysis as it reviews

Plaintiffs' claims.  For the reasons explained above, Plaintiffs have not fully briefed the Court on

the plain language of the law, nor have they fully explained the facts or the analysis actually

performed by the BLM as it adopted the decisions at issue in this case.  Finally, there are

significant procedural bars to most, if not all, of Plaintiffs' claims.  For all of these reasons,

Amicus respectfully request that the Court deny Plaintiff's Motion for Summary Judgment and

dismiss this matter in full.

Dated this 21st day of February, 2007.

DUNN CARNEY ALLEN HIGGINS & TONGUE LLP


/s/ Elizabeth E. Howard

Elizabeth E. Howard, OSB No. 01295
Telephone: (503) 224-6440

Page 34     AMICUS CURIAE BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT